UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CLAYTON FRANKLIN, as Administrator
for the Estate of Cody J. Franklin                                      PLAINTIFF

v.                                    No. 2:17-CV-2016

FRANKLIN COUNTY, ARKANSAS, et al.                        DEFENDANTS

## OPINION AND ORDER

Separate Defendants Anthony Boen, in his official capacity as Franklin County Sheriff;

Franklin County Sheriff's Department; Franklin County, Arkansas; Nicholas James, individually

and in his capacity as a Franklin County Sheriff's Deputy; and James Taylor Molton ("County

Defendants") filed a motion (Doc. 43) for summary judgment, brief (Doc. 44) in support, and

statement of facts (Doc. 45). Plaintiff Clayton Franklin filed a response (Doc. 49) in opposition,

a brief (Doc. 50) in support, and a response (Doc. 51) in opposition to the County Defendants'

statement of facts. The County Defendants filed a reply (Doc. 73). The County Defendants'

motion will be GRANTED.

Separate Defendants Joseph Griffith; Nathan Griffith; and the City of Ozark, Arkansas

("City Defendants") also filed a motion (Doc. 53) for summary judgment, a brief (Doc. 54) in

support, and a statement of facts (Doc. 55). Clayton Franklin filed a response (Doc. 60) in

opposition, a brief (Doc. 61) in support of his response, and a response (Doc. 62) to the City

Defendants' statement of facts. The City Defendants' filed a reply (Doc. 66). The City

Defendants' motion will be GRANTED IN PART and DENIED IN PART.

## I.    Background

On May 10, 2016, at 7:16 p.m., the Franklin County Sheriff's Office received a call from William Jones that a suspicious person was "swinging a stick like a sword" and "going up driveways and walking up and down the road." (Doc. 51, ¶ 9). Franklin County Sheriff's Office dispatched Deputy Matt Young to investigate. *Id.*, ¶ 10. Deputy Young found the suspicious person in a ditch off of Westview Road waving a long walking stick around. (Doc. 45, p. 49). Deputy Young identified the suspicious person as Cody Franklin. *Id.* Franklin was twenty years old, six feet tall, and weighed two hundred pounds. (Doc. 55-3, pp. 1-2). Deputy Young questioned Franklin about his location and where he was staying and noted that Franklin made multiple inconsistent statements regarding his previous criminal history and his reasoning for being in a ditch. (Doc. 45, p. 50). Deputy Young placed Franklin under arrest for obstructing governmental operations. (Doc. 51, ¶ 12). Deputy Young drove Franklin to the Franklin County Detention Center. (Doc. 51, ¶ 13). Upon arrival, Deputy James Taylor Molton processed Franklin into the detention center. *Id.* Franklin was allowed to make several calls to seek assistance in paying bail to be released from the detention center. (Doc. 51, ¶ 14). One of the calls Franklin made during this time was to his girlfriend, Leanna Crowley. (Doc. 51, ¶ 15). Franklin told Crowley that if he stayed in the detention center over night, he would "tear[]" [the] motherfucker apart," and that if he was in there another 15 minutes it would "take them three fucking dart guns, at least" to control him. (Doc. 51, ¶ 15). Franklin was unable to make bail and was placed into the general population pod by Deputy Molton. (Doc. 51, ¶ 16). Deputy Molton then went off duty and was replaced by Deputy Nicholas James. (Doc. 51, ¶ 17).

The Plaintiff and Defendants' stories regarding the subsequent events diverge once Franklin was placed in the general population pod. Defendants claim that around midnight, in the

early morning of May 11, 2016, Deputy James went to "inspect the sounds of an altercation in the general population pod," and that other inmates informed him that Franklin was starting fights with inmates who were sleeping. (Doc. 45, ¶ 18; Doc. 45, p. 16). Conversely, Clayton Franklin produces evidence from an inmate detained in the detention center that evening that law enforcement officers at the Franklin County Detention Center told inmates that they "had a fighter coming" and had encouraged the altercations. (Doc. 51, ¶ 18; Doc. 50-10, p. 1). Deputy James observed Franklin throwing his mat, blanket and clothes, and cursing in the general population pod, causing other inmates to lock themselves into their cell areas. (Doc. 45, ¶ 19; Doc. 45, p. 17). Deputy James decided to move Franklin to an isolated cell because of Franklin's aggressive behavior and apparent intoxication from drugs. (Doc. 45, p. 17). Deputy James requested assistance to move Franklin to an isolated cell and Officer Nathan Griffith of the Ozark Police Department arrived at the detention center to assist Deputy James. (Doc. 45, p. 76).

Deputy James opened the cell door and asked Franklin to "come with [him]." (Doc. 45, p. 79). However, Franklin refused to go anywhere and stated "come on," "lets go," and "I done fucked one dude up!" while crouching in a fighting stance. (*Id*; Doc. 55-1, p. 4). James tried to calm Franklin by telling him that he did not want to fight; however, Franklin responded by placing several items on his mat, rolling it into a ball, and throwing it at Deputy James. (Doc. 55-1, p. 4). The mat hit Deputy James in the head. *Id.* Franklin attempted to grab Deputy James's wrist and pull him into the cell. *Id.* Franklin finally exited the cell, slammed the door, and stated, "I'm not going anywhere I'm going to sleep right here." (Doc. 45, p. 80). Franklin then grabbed Deputy James's shirt. *Id.* Officer Griffith stepped in to separate Deputy James from Franklin. *Id.* Officer Griffith grabbed Franklin around his waist and moved Franklin against the cell wall. (Doc. 55-1, p. 5). Franklin, however, was able to push himself away from the wall and

Officer Griffith maneuvered Franklin to the floor. *Id.* Franklin then kicked his legs and pushed Officer Griffith off of him. *Id.* Franklin was able to return to his feet. *Id.* In response, Officer Griffith fired his electronic control device ("taser") and Franklin fell to the ground. *Id.* Officer Griffith instructed Franklin to roll over on his stomach and place his hands behind his back when the taser cycle was over. (Doc. 45, p. 228). However, when the cycle ended, Franklin started to stand up. *Id.* Officer Griffith then pulled the taser trigger, initiating a second taser cycle, and commanded Franklin to roll over on his stomach and place his hands behind his back. *Id.* Franklin did not comply, and Officer Griffith initiated a third taser cycle against Franklin. *Id.* The third taser cycle appeared to have no effect on Franklin, as he was able to reach a standing position. *Id.* Griffith initiated a taser cycle two more times, but the taser appeared to have no effect on Franklin. *Id.*

Franklin then walked toward Deputy James and Officer Griffith again. *Id.* Officer Griffith grabbed Franklin around his head and arm and again maneuvered Franklin to the ground. (Doc. 55-1, p. 5). Deputy James then handcuffed Franklin. *Id.* Deputy James and Officer Griffith attempted to stand Franklin up to walk him to the isolation cell. *Id.* However, Franklin refused to stand, so the officers had to drag him by his arms to the cell. *Id.* Deputy James and Officer Griffith claim that Franklin was attempting to kick them the entire time. *Id*.

Plaintiff presents evidence that the officers dragged Franklin to the isolation cell not because of Franklin's resistance, but because the officers had choked Franklin out until he was unconscious during the struggle in the hallway. (Doc. 50-10, p. 2). Regardless, the isolation cell video demonstrates that Franklin regained consciousness before entering the isolation cell. (Doc. 45, Ex. 13).

Deputy James and Officer Griffith then placed Franklin in the isolation cell. (Doc. 45, p. 81). Around this time, Sergeant Joseph Griffith of the Ozark Police Department arrived to assist Deputy James and Officer Griffith in removing the handcuffs from Franklin for his time in the isolation cell. *Id.* Officer Griffith placed his knee on Franklin's back between Franklin's shoulder blades. (Doc. 55-1, p. 5). Deputy James held Franklin's legs to prevent him from kicking. *Id.* Sergeant Griffith secured Franklin's hip area with his hands. *Id.* Franklin continued to struggle and Sergeant Griffith grabbed Officer Griffith's taser and warned Franklin that he would deploy the taser again if he kept resisting. *Id.* Franklin did not stop struggling, so Sergeant Griffith tased Franklin in drive-stun mode.[1] *Id.* Sergeant Griffith claims he believed that this tasing had "little effect," so he tased Franklin a second time. *Id.*, p. 6. Franklin continued to struggle and Sergeant Griffith used the taser a third time.[2] *Id.* After the third tasing, Franklin "stopped fighting and relaxed his arms" allowing the officers to remove the handcuffs. *Id.* The officers checked Franklin's wrist and neck for a pulse and signs that Franklin was breathing before exiting the cell. *Id.* The officers then returned to the dispatch room and watched Franklin on a monitor for a few minutes, during which time Franklin was not moving. *Id.* Sergeant Griffith then told Debbie Ross, dispatcher at the Franklin County Detention Center, to call Emergency Medical Services to provide medical assistance for Franklin. The officers returned to the isolation cell and again checked Franklin for a pulse. *Id.* Finding none, Officer Griffith started chest compressions and then assisted EMTs in getting Franklin to the ambulance when they arrived. Franklin was

---

[1] "In drive-stun mode, the taser is pressed against the subject's body, which causes a painful current to run through the specific body area to which the taser is applied but does not cause neuromuscular incapacitation." Aaron Sussman, *Shocking the Conscience: What Police Tasers and Weapon Technology Reveal About Excessive Force Law*, 59 UCLA L. Rev. 1342, 1350 (2012).

[2] The isolation cell video provided to the Court only clearly shows one tasing during the struggle in the isolation cell. (Doc. 45, Ex. 13).

taken by EMS to Mercy Hospital in town, and at 3:13 a.m., he was pronounced dead. The medical examiner's report showed that Franklin had "a toxic level methamphetamine" in his system at the time of death. (Doc. 61-7, p. 12). The medical examiner stated that the cause of death was "methamphetamine intoxication, exertion, struggle, restraint, and multiple electro muscular disruption device applications." *Id.*, p. 1.

Both Franklin County and the City of Ozark had policies regarding detention and use of force procedures, including the use of tasers on detainees. (Doc. 45, p. 239; Doc. 55-11). Franklin County Deputy Nicholas James had received Arkansas Crime Information Center ("ACIC") Level I training, was provided with the Franklin County Detention Center Rules and Procedures, and was trained in-person at the detention facility. City of Ozark Officer Nathan Griffith and Sergeant Joseph Griffith graduated from police academy and received training on the use of tasers from the Taser Training Academy. (Doc. 55, Ex. L).

## II.    Legal Standard

When a party moves for summary judgment, the party must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). In order for there to be a genuine issue of material fact, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only facts "that might affect the outcome of the suit under the governing law" need be considered. *Anderson*, 477 U.S. at 248. "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof."

*P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001). Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Id*. at 656–57.

## III.    Wrongful Death Recovery

As a threshold matter, the City Defendants assert that Plaintiff cannot bring a claim under 42 U.S.C. § 1983 for alleged violations of Franklin's constitutional rights through the Arkansas Wrongful Death statute and Plaintiff's claims should be dismissed as a matter of law. The question of which damages are available in a § 1983 action has been subject to considerable debate. *See Carringer v. Rodgers*, 331 F.3d 844, 850 n.9 (11th Cir. 2003) (noting the different ways circuits have handled wrongful death claims under § 1983). "Although Congress clearly envisioned § 1983 to serve as a remedy for wrongful killings that resulted from proscribed conduct, the statute itself does not provide a mechanism to implement such a remedy." *Berry v. City of Muskogee*, 900 F.2d 1489, 1502 (10th Cir. 1990). When a constitutional violation results in death, "§ 1983 does not specify whether the cause of action it creates survives death, who are the injured parties, the nature of the claims that may be pursued or who may pursue them, or the types of damages recoverable." *Id.* In these cases, 42 U.S.C. § 1988 "authorizes federal courts to undertake a three-step process to determine whether to borrow law from another source to aid their enforcement of federal civil rights statutes." *Id.* The Court must: (1) look to federal law if such laws are suitable to carry the statute into effect; (2) in the absence of such a federal law, the court must consider borrowing the law of the forum state; and (3) the court must reject any state law that is "inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988.

In *Andrews v. Neer*, 253 F.3d 1052 (8th Cir. 2001), the Eighth Circuit considered whether, in a § 1983 action, a plaintiff could recover damages for injuries she personally suffered as a result of her father's death by borrowing the remedies available under the Missouri wrongful death statute. Adopting the Tenth Circuit's reasoning in *Berry*, the Eighth Circuit answered the question in the negative. *Id.* at 1063-64. Under Missouri's wrongful death statute, family members could recover for their own injuries, and such an action "would impermissibly broaden the types of injuries for which Congress intended recovery to be available under § 1983's authorization of liability 'to the party injured.'" *Id.* at 1064 (citing 48 U.S.C. § 1983). Because the statute provided a mechanism for the plaintiff to assert a claim for a violation of her own constitutional rights, and pursue a state law wrongful death claim, permitting wrongful death damages in a § 1983 action would "shoehorn" recovery available under state wrongful death statutes into the recovery under § 1983 for the decedent's injuries. *Id.* State law wrongful death actions are "not suitable to carry out the full effects intended for § 1983 cases ending in death of the victim." *Berry*, 900 F.2d at 1506. Though "federal courts must fashion a federal remedy to be applied to § 1983 death cases. . . . [that] remedy should be a survival action, brought by the estate of deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'" *Id.* at 1506-07 (quoting 42 U.S.C. § 1983).

Though the amended complaint explicitly references only the Arkansas wrongful death statute, a party need not expressly invoke a claim to survive federal pleading standards. *See Johnson v. City of Shelby*, 135 S.Ct. 346, 347 (2014). All that is required is that a plaintiff plead facts sufficient to support a claim for recovery. *Id.* ("Having informed [the defendant] of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim."). Plaintiff's claim sufficiently details a § 1983

claim for his damages for injuries Franklin suffered – including pain and suffering, funeral expenses, loss of life, and lost wages – under the survival statue.

The amended complaint also seeks damages for, among other things, termination of the parent-child relationship, including the loss of companionship, and the mental anguish suffered by the parents and sibling as a result of Franklin's death. (Doc. 6, ¶ 46(A)-(B)). These damages are available to beneficiaries for their own injuries following the death of the decedent by virtue of the Arkansas wrongful death statute. Ark. Code Ann. § 16-62-102(f). The estate acts as "a conduit through which to channel [state law wrongful death] claims" to the estate's beneficiaries. Howard W. Brill, Ark. Law of Damages § 34:1 (5th Ed. 2018). Damages for injuries suffered by individuals other than the decedent are not recoverable by the decedent's estate for the decedent, as these claims are inconsistent with purposes of § 1983. *See Andrews*, 253 F.3d at 1064. However, because the complaint also brings an Arkansas state law tort claim for the wrongful death of Franklin (Doc. 6, ¶¶ 42-44), and because this Court exercises supplemental jurisdiction over that claim pursuant to 28 U.S.C. § 1367, Clayton Franklin (as administrator of Franklin's estate) may pursue wrongful death remedies separate from Franklin's § 1983 claim.

## IV.   County Defendants

### A.  James Taylor Molton – Individual Capacity

The County Defendants seek dismissal of all claims against James Taylor Molton because he was not involved with the actions that led to Franklin's death. A law enforcement officer sued in his individual capacity cannot be held liable for damages under § 1983 when a plaintiff has failed to allege that the officer was involved in or had direct responsibility for the incidents that injured him. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) ("Appellant does not allege that Baltz was personally involved in or had direct responsibility for incidents that injured him.

His claims, therefore, are not cognizable in § 1983 suits."); *Marchant v. City of Little Rock, Ark.*, 741 F.2d 201, 204 (8th Cir. 1984).  Franklin admits that after placing Cody Franklin into the general population pod, Deputy Molton went off duty and "did not have any other involvement with Cody Franklin or in the matter at issue in this lawsuit."  (Doc. 51, ¶17).  Accordingly, Franklin's claims against James Taylor Molton in his individual capacity are dismissed.

**B.  Sheriff Anthony Boen (Official Capacity)/Franklin County Liability**

A suit brought against a county sheriff in his official capacity is treated as a suit against the county.  *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998).  Respondeat superior or vicarious liability does not attach under § 1983; rather "[t]o establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity."  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing to *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978)).  Municipal liability attaches in two specific instances: "1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and 2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences."  *Id.* at 817-18.  The Plaintiff does not allege that Franklin County's detention and use of force policies are unconstitutional on their face.  Rather, Plaintiff asserts that Franklin County was "deliberately indifferent" to Franklin's constitutional rights because of its failure to properly train and supervise its officers, its choice to cover up the misconduct, its failure to appropriately discipline officers, and its failure to properly maintain its detention facility. (Doc. 6, pp. 11-12).

A finding of "deliberate indifference" requires the Court to determine whether the municipality maintained a policy, "in which an inadequacy was so obvious . . . and so likely to

result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably said to have been deliberately indifferent." *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999). Franklin County had a taser policy in place at the time of the incident, even though its jailers were not carrying tasers at the time. (Doc. 45, p. 275). The policy required Franklin County officers to move through a use-of-force continuum before using a taser and directed officers on appropriate taser use, if they were forced to use one. The policy discussed the disciplinary repercussions of misusing a taser. Plaintiff presents no evidence that Franklin County should have been on notice that its current taser policy was inadequate or substantially likely to result in a constitutional violation. (Doc. 45, p. 275).

Plaintiff also alleges that Franklin County engaged in an unwritten policy or practice of instigating fights between inmates and engaging in excessive force. "When a plaintiff alleges an unwritten or unofficial policy, there must be evidence of a practice, so permanent and well-settled so as to constitute a custom, that existed." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (noting that two incidents of excessive force cannot be considered a pattern of widespread and pervasive unconstitutional conduct to subject a municipality to liability). A plaintiff may properly allege a claim under § 1983 imposing municipal liability on an unofficial custom if he demonstrates: "1) the existence of continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; 2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation." *Corwin v. City of Indep., Mo.*, 829 F.3d 695, 700 (8th Cir. 2016).

Plaintiff has failed to put forth sufficient evidence that would allow a reasonable jury to find that instigating fights or using excessive force against detainees was widespread and persistent at the Franklin County Detention Center. Franklin submits testimony briefly detailing two other cases *after* Franklin's case where pretrial detainees allege injury because of excessive force used at the Franklin County Detention Center. Plaintiff provides no other evidence that suggests that Franklin County officers encouraged fighting between inmates or consistently engaged in the improper use of tasers on detainees prior to the incident preceding Franklin's death.

Plaintiff further alleges that Franklin County was deliberately indifferent to Franklin's constitutional rights because it failed to appropriately train and supervise its officers. To allege a failure-to-train or supervise claim, the plaintiff must demonstrate that the municipality "had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996). Franklin County Deputy Nicholas James was trained by ACIC, had received the Franklin County Detention Center Rules and Procedures, and had received additional on-site training regarding proper detention practices. Plaintiff fails to establish evidence that Franklin County was previously put on notice of prior police misconduct that would necessitate it providing additional or different training than those that Deputy James received. Thus, it cannot be said that Franklin County was deliberately indifferent to the alleged unconstitutional conduct by failing to provide additional or different training procedures.

Finally, Plaintiff alleges that Franklin County was deliberately indifferent by failing to properly maintain its detention facilities in accordance with state and national jail standards. Plaintiff's claim fails for two reasons. First, although helpful and relevant in some cases, jail standards "do not represent minimum constitutional standards." *Grayson v. Ross*, 454 F.3d 802, 812 (8th Cir. 2006). Second, any lack of maintenance issues that Plaintiff may point to must also

be a "moving force" behind the Plaintiff's injuries. Plaintiff's injuries were a result of his own methamphetamine ingestion and the force applied by law enforcement officers during the alleged incident, not Franklin County's failure to maintain its detention center. Thus, Plaintiff's deliberate indifference claim for failure to maintain facilities fails.

### C. Deputy Nicholas James - Excessive Force

Plaintiff also alleges that Deputy Nicholas James engaged in excessive force in attempting to move Franklin from the general population pod to the isolated cell. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

> Factors relevant to assessing the objective reasonableness of force used by officers include: the relationship between the need for the use of force and the amount of force used; the extent to the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* "Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public." *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012). Force may be justified if the individual was "actively resisting" the commands of law enforcement. *Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017) (holding that officers placing body weight on the plaintiff and tasing the plaintiff twice in drive stun mode was objectively reasonable where the plaintiff was not complying with officers' commands and continued to resist restraint).

Deputy James was an active participant in subduing and restraining Franklin throughout the altercation between the officers and Franklin. However, Deputy James used reasonable force in his efforts to subdue Franklin. Plaintiff presents no evidence that Deputy James fired a taser or used more force than necessary to place handcuffs on Franklin and move him to the isolation cell. Accordingly, Deputy James used reasonable force and Franklin's claims against him are dismissed.

### D. Deliberate Indifference to Franklin's Serious Medical Need

The Eighth Amendment of the United States Constitution protects pretrial detainees who are injured because of a prison official's choice to ignore a serious medical need. *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). In order to impose liability on a municipality for such a failure, the Plaintiff must demonstrate that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official [was] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he drew that inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Mere negligence or even gross negligence by the prison official will not establish deliberate indifference. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

Plaintiff fails to present sufficient facts demonstrating that Deputy James, a layperson, knew that Franklin was in danger of serious medical harm as a result of the prolonged encounter between the officers and Franklin. After the officers removed the handcuffs from Franklin, Officer Griffith checked Franklin's pulse to ensure that he was alive and breathing. Deputy James and the other officers observed Franklin from a monitor for a few minutes in the dispatch area of the detention facility before going back into the room to discover that Franklin no longer had a pulse. Officer Griffith then directed Debbie Ross to call for an ambulance to come to the detention facility

as quickly as possible. There is no evidence in the record that suggests that Deputy James was aware that the prolonged struggle and tasing of Franklin would pose an excessive health risk that required immediate medical attention. Furthermore, even if an inference could be drawn that Deputy James was aware of a substantial risk of harm, Deputy James was not deliberately indifferent. The officers observed Franklin when they stepped out of the cell and called for an ambulance when they realized that he was not moving. It may be arguable that Deputy James was negligent in failing to secure immediate evaluation of Franklin after the prolonged struggle, but the facts do not indicate that Deputy James and the other officers were deliberately indifferent to Franklin's medical needs. Plaintiff's claim against Deputy James for deliberate indifference to his medical needs is dismissed.

### E. Battery

Plaintiff also brings a state law battery claim against Deputy James. In Arkansas, to bring a tort claim for battery, the Plaintiff must prove "that the Defendant acted with intent to cause some harmful or offensive conduct with a person, or acted with the intent to create apprehension of some harmful or offensive contact with a person; and . . . that a harmful or offensive contact resulted." AMI 418 (2018). In the law enforcement context, an officer may "exert such force as is necessary . . . to subdue the efforts of the prisoner to escape; but he cannot in either case take the life of the accused, or even inflict upon him a great bodily harm except to save his own life or to prevent a like harm to himself." *Crouch v. Richards*, 208 S.W.2d 460, 462 (Ark. 1948). Plaintiff has not presented sufficient evidence that would allow a reasonable jury to find that Deputy James used more force than was necessary to restrain Franklin and protect himself from injury during the incident. As a result, Plaintiff's claim for battery against Deputy James is dismissed.

### F.  Qualified Immunity

Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005). The issue of qualified immunity need only be addressed if the government actor's conduct violated a constitutional right. *Id.*  If the conduct as alleged would violate a constitutional right, the Court then inquires into "whether the right was clearly established." *Id.*  The State of Arkansas applies the same qualified immunity analysis for state law actions against local law enforcement authorities as is applied under federal law. *Graham v. Cawthorn*, 427 S.W.3d 34, 16 (Ark. 2013); *Rainey v. Hartness*, 5 S.W.3d 410, 417 (Ark. 1999) (recognizing similarity between state law qualified immunity and federal qualified immunity). Here, Deputy James conduct was constitutional, so it is unnecessary to analyze whether Deputy James' actions violated a clearly established right.

## V.  City Defendants

### A.  City of Ozark Municipal Liability

"To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing to *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978)).  Municipal liability attaches in two specific instances: "1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and 2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Id.* at 817-18.  Franklin does not allege that municipal liability on the part of the City of Ozark attaches because of a particular custom or policy

in place at the time of the incident. Rather, Franklin asserts that the City of Ozark was "deliberately indifferent" because of its failure to properly train and supervise its officers, its choice to cover up the misconduct, and its failure to appropriately discipline officers. (Doc. 6, p. 11).

A finding of "deliberate indifference" requires the Court to determine whether the municipality maintained a policy, "in which an inadequacy was so obvious . . . and so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably said to have been deliberately indifferent." *Spencer*, 183 F.3d at 906. To allege a failure-to-train or supervise claim, the plaintiff must demonstrate that the municipality "had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Andrews*, 98 F.3d at 1075. The City of Ozark had a use of force and taser use policy in its police department policy manual. (Doc. 55-11, pp. 22-23). The policy provides specific requirements and limitations for using a taser to subdue a detainee.[3] Officer Griffith and Sergeant Griffith were both trained in taser use by the Taser Training Academy and had graduated from the police academy. Plaintiff provides no evidence that the City of Ozark should have been on notice that its current policies and training were so inadequate that they would likely result in a violation of constitutional rights. Furthermore, if the City of Ozark covered up the actions of its officers during this incident as alleged by the Plaintiff, it still would not prove deliberate indifference on the part of the City. Rather, it would be evidence in future cases that the City had been put on notice of prior incidents of police misconduct and deliberately failed to take remedial action. As a result, Plaintiff has not established that the City of Ozark is liable under § 1983.

---

[3] The policy specifically prohibits using a taser on a handcuffed subject unless exigent circumstances are present. (Doc. 55-11, p. 23).

## B. Excessive Force – Officer Nathan Griffith and Sergeant Joseph Griffith

Plaintiff also alleges that Officer Nathan Griffith and Sergeant Joseph Griffith engaged in excessive force by tasing Franklin multiple times during the course of the incident. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

> Factors relevant to assessing the objective reasonableness of force used by officers include: the relationship between the need for the use of force and the amount of force used; the extent to the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* Again, "[f]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public." *Shekleton*, 677 F.3d at 366. However, force may be justified if the individual was "actively resisting" the commands of law enforcement. *Ryan*, 850 F.3d at 428.

There is a genuine issue of material fact regarding whether Officer Nathan Griffith and Sergeant Joseph Griffith's tasings of Franklin were objectively reasonable. Plaintiff puts forth evidence that suggests that although Franklin was combative, non-compliant, and aggressive, he was contained in the detention facility, did not have any weapons, was restrained with handcuffs and at the end was physically held face down on the floor of the isolation cell by three law enforcement officers. Accordingly, viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could find that at some point or points Officer Nathan Griffith and Sergeant Joseph

18

Griffith used excessive force by tasing Franklin multiple times during the transport of Franklin from the general population pod to the isolation cell.

**C.  Deliberate Indifference to a Significant Medical Need**

Plaintiff has not provided sufficient evidence to demonstrate that Officer Griffith and Sergeant Griffith knew that Cody Franklin was in danger of serious medical injury because of the prolonged encounter between the officers and Franklin.  After the officers finally removed the handcuffs from Franklin, Officer Griffith confirmed that Franklin had a pulse and was breathing.  The officers then observed Franklin from a monitor in the dispatcher's office for a few minutes before going back into the room with Franklin and discovering that he no longer had a pulse.  The officers then called for an ambulance to come to the scene to attend to Franklin.  Even if the officers were aware that there was a substantial risk of serious harm, Officer Griffith and Sergeant Griffith were not deliberately indifferent to Franklin's medical needs.

**D.  Battery and Wrongful Death**

In Arkansas, to bring a tort claim for battery, the Plaintiff must prove "that the Defendant acted with intent to cause some harmful or offensive conduct with a person, or acted with the intent to create apprehension of some harmful or offensive contact with a person; and . . . that a harmful or offensive contact resulted."  AMI 418 (2018).  In the law enforcement context, an officer may "exert such force as is necessary . . . to subdue the efforts of the prisoner to escape; but he cannot in either case take the life of the accused, or even inflict upon him a great bodily harm except to save his own life or to prevent a like harm to himself."  *Crouch*, 208 S.W.2d at 462.  "As a tort action, the wrongful death claim requires fault, proximate cause, comparison of fault, and proof of damages based in part upon the decedent's health and life expectancy."  Howard W. Brill, Ark. Law of Damages § 34:1 (5th ed. 2018).

There are genuine issues of material fact about whether Officer Griffith and Sergeant Griffith used more force than was necessary to subdue Cody Franklin and move him to the isolation cell. There are also genuine issues of material fact about whether Officer Griffith and Sergeant Griffith's tasing and use of force was the proximate cause of Franklin's death  Those claims will proceed to trial.

**E. Qualified Immunity**

Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005). The issue of qualified immunity need only be addressed if the government actor's conduct violated a constitutional right. *Id.* If the conduct as alleged would violate a constitutional right, the Court then inquires into "whether the right was clearly established." *Id.* Because there is a genuine issue of material fact regarding whether Officer Griffith and Sergeant Griffith used excessive force in tasing Cody Franklin on the night of the incident, the Court must next determine whether the right was "clearly established." "When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident." *Shekleton*, 677 F.3d at 366. "The dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 367. "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* It is clearly established in the Eighth Circuit that it is excessive force to use a taser on a nonfleeing, nonviolent misdemeanant. *Id.*

Officer Griffith and Sergeant Griffith argue that Franklin's case is factually similar to *Ryan v. Armstrong*, 850 F.3d 419 (8th Cir. 2017). However, *Ryan* is distinguishable. In *Ryan*, the detainee was tased in drive stun mode twice before the officers placed restraints on him. Conversely, Officer Griffith tased Franklin five times during the first altercation between Franklin and the officers in the hallway. Once Officer Griffith and Deputy James were able to place handcuffs on Franklin, Sergeant Griffith then tased Franklin another *three* times in the isolation cell. Because Franklin was restrained while Sergeant Griffith tased him, he was unlikely to place the officers in danger or fear; however, they continued to tase him to seek compliance. As a result, Officer Griffith and Sergeant Griffith are not entitled to qualified immunity on the excessive force claim.

Officer Griffith and Sergeant Griffith also argue that they are immune from suit on Plaintiff's state law claims. The State of Arkansas applies the same qualified immunity analysis for state law actions against local law enforcement authorities as is applied under federal law. Ark. Code Ann. § 19-10-305; Ark. Code Ann. 21-9-301; *City of Fayetteville v. Romine*, 284 S.W.3d 10, 13-14 (Ark. 2008) (explaining state law qualified immunity for state, county, and municipal employee is traditionally evaluated in same manner as federal qualified immunity). Because there are genuine issues of material fact about whether Officer Griffith and Sergeant Griffith used more force than necessary to subdue Franklin, the Court must determine whether it is clearly established that the use of tasers under the conditions presented in this case is a violation of constitutional law. *Martin v. Hallum*, 374 S.W.3d 152, 158 (Ark. App. 2010). As demonstrated above, Eighth Circuit law is clearly established that using a taser against a non-fleeing, non-violent misdemeanant is excessive force. Because there is a question of fact regarding whether Officer Griffith and

Sergeant Griffith used more force than was necessary against Franklin, they are not entitled to immunity on Franklin's state law claims.

IT IS THEREFORE ORDERED that the County Defendants' motion (Doc. 43) for summary judgment is GRANTED and Plaintiff's claims against all County Defendants are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the City Defendants' motion (Doc. 53) for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's claims against the City of Ozark, Arkansas are DISMISSED WITH PREJUDICE. Furthermore, Plaintiff's claim against Nathan Griffith and Joseph Griffith for deliberate indifference to a significant medical need is DISMISSED WITH PREJUDICE. Plaintiff's claims against Nathan Griffith and Joseph Griffith for excessive force, battery, and Plaintiff's wrongful death claim brought for Franklin's beneficiaries, remain pending.

IT IS SO ORDERED this 19th day of April, 2019.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE